UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID A. KADLEC,

        Petitioner,

    v.                                   Case No. 97-CR-98
                                                04-C-468

UNITED STATES OF AMERICA,

        Respondent.

## GOVERNMENT'S RESPONSE TO SECTION 2255 MOTION

### BACKGROUND

On June 15, 2000, a jury found defendant David A. Kadlec guilty of RICO and RICO conspiracy. He was sentenced to two life terms to run concurrently for a total term of life in prison. Kadlec appealed to the Seventh Circuit Court of Appeals, which affirmed the convictions and sentence. He then filed a motion for a rehearing en banc followed by a petition for certiorari to the United States Supreme Court, both of which were denied.

On May 17, 2004, Kadlec filed a *pro se* Motion to Vacate, Set Aside, or Correct Sentence, pursuant to Title 28, United States Code, § 2255. He alleges twelve grounds for relief, eleven of which are based on claims of ineffective assistance of counsel, and one of which is based upon an allegation that the United States blatantly breached the provisions of the Interstate Detainer Act resulting in a violation of his Fifth Amendment right to due process. On September 14, 2005, Kadlec filed a motion which he entitled "Request for Leave to Addendum §2255 With Affidavit in Support Thereof" by which he seeks to add a thirteenth ground, in which is a claim relief based on newly discovered evidence.

On October 19, 2005, the Court entered an order directing the government to file a response to Kadlec's original motion. For the reasons set forth below, Kadlec's 2255 motion should be denied, and the relief he seeks September 14, 2005 motion to amend should also be denied.

**DISCUSSION**

I.      **Grounds A-L (I-XI):  Ineffective Assistance of Counsel**

Kadlec's original motion raises twelve distinct claims, all of which he characterizes as instances of ineffective assistance of counsel. A defendant's claim that his counsel rendered ineffective assistance is evaluated by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on an ineffective assistance of counsel claim, a defendant has the heavy burden of affirmatively establishing that counsel's performance was constitutionally deficient and that the deficiency prejudiced the outcome of the trial. *Harris v. Reed*, 894 F. 2d 871, 877 (7th Cir. 1990). He must show both that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms, and that but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U. S. at 688, 694. See also, *United States v. Zarnes*, 33 F. 3d 1454, 1473 (7th Cir. 1994). In terms of the performance prong, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Only those "who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ. . ." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The burden for a defendant is high when he attempts to contend his counsel's trial strategy was ineffective

2

because *"Strickland* builds in an element of deference to counsel's choices in conducting the litigation." *Holman v. Gilmore*, 126 F. 3d 876,881 (7th Cir. 1997). In order to establish prejudice under the second prong, the unprofessional errors of counsel must be so egregious "that the trial was rendered unfair and the verdict rendered suspect." *Morrison*, 477 U.S. at 374.

In the instant case the record reflects that Kadlec, a member of the Janesville/Stateline chapter of the Outlaws Motorcycle Club, was charged with sixteen other Outlaws members in an indictment that charged him with RICO and RICO conspiracy and which named him in three racketeering acts. He was named in both the original indictment, and the superseding indictment which followed after the original indictment was dismissed. Throughout the proceedings Kadlec was represented by Attorney Mark Rosen, who handled four rounds of pre-trial motions, an interlocutory appeal and the jury trial. The record reflects Rosen approached the case at trial by attempting to minimize Kadlec's connection to his co-defendant Outlaws and persuade the jury that the evidence fell short of establishing Kadlec's guilt with regard to the two counts and three underlying racketeering acts with which he was charged. This approach is apparent in Rosen's opening statement, the focus of the cross examination of the witnesses who inculpated Kadlec, his alibi defense with regard to the Wagner homicide, and his closing argument. The record further reflects that Rosen was prepared to defend Kadlec, that he conducted an appropriate cross examination of all witnesses whose testimony was potentially harmful to Kadlec, that he interposed appropriate objections throughout the trial, and that he often joined the objections of other defense counsel on Kadlec's behalf.

In alleging his counsel to be ineffective, Kadlec now argues that his counsel failed in myriad ways but ultimately he fails to show that counsel's overall performance was deficient as

3

required by *Strickland*, or that any of the specific missteps with which he charges his counsel, alone or in combination, prejudiced his case so as to lead to the conclusion "that the trial was rendered unfair and the verdict rendered suspect." See *Morrison*, 477 U.S. at 374.

### A.    Ground I: Failure to challenge search warrant

Kadlec first claims that his counsel wrongfully failed to challenge the reliability of an informant whose information formed part of the basis for a search warrant executed at his property in July 1995. The record does not reflect that there was any challenge to this search warrant, so that Kadlec's actual complaint appears to be that his counsel failed to challenge the admissibility of evidence obtained by a search warrant based on the sufficiency of the supporting information. He states that a CI who provided information to support the warrant was unreliable for a number of reasons, and that the facts offered in support of the warrant were contradicted by other known facts. He claims that he was prejudiced because as the result of the execution of the warrant, the government was able to provide "extensive testimonies of law enforcement agents" and to "impeach him."

When a claim of ineffective assistance of counsel is based on counsel's failure to present a motion to suppress, the defendant is required to prove the motion was meritorious. See *United States v. Cieslowski*, 410 F. 3d 353 360 (7th Cir. 2005) citing *Owens v. United States*, 387 F. 607, 610 (7th Cir. 2004); *United States v. Stewart*, 388 F. 3d 1079, 1084 (7th Cir. 2004). Here Kadlec fails to do so. He fails to provide sufficient information to demonstrate that the overall information offered in support of the warrant did not give rise to probable cause, so that a motion to suppress would have been successful. In addition, he fails to show that any items obtained in the allegedly illegal search were offered as evidence against him in the government's case in

4

chief, so that there was any prejudicial evidence gathered by virtue of the unchallenged warrant.

The record reflects an apparent reference to this warrant in the testimony of Detective Jimmy Luedtke, a Racine County Sheriff Investigator who was involved in the investigation of the Donald Wagner homicide (Racketeering Act 2). Luedtke testified that several years after the Wagner homicide, he executed a warrant on Kadlec's property. He testified that he was interested in Kadlec's El Camino truck, and that he recovered some documents and a personal Rolodex. R. 1831: 555-556. None of these items of evidence were offered in connection with this testimony, or at any point during the prosecution's case in chief, and Luedtke testified that he did not consider his search to have uncovered anything inculpatory. R.1831: 605. Finally, although Kadlec fails to explain how the fruits of this search were used to impeach him, it is well established that even unlawfully obtained evidence maybe used to impeach a defendant. See *Walder v. United States,* 347 U.S. 62 (1954) permitting the prosecutor to introduce into evidence heroin obtained through an illegal search to undermine the credibility of the defendant's claim that he had never possessed narcotics. The Court explained that a defendant "must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenged his credibility." *Id.* at 65.

In the final analysis, Kadlec does not demonstrate that this claim provides a basis for finding his counsel to be ineffective under the requirements of *Strickland.*

5

**B.    Ground II: Failure to call exculpatory witness**

Kadlec next complains that his counsel refused to call as a defense witness, a man named Ted Dubinsky, whom he claims would have testified that at about the time of the Donald Wagner murder (Racketeering Act 2) he was passing by the boat launch where Wagner was killed and he did not see Kadlec near Wagner. Kadlec argues that he was prejudiced by this omission, since the testimony would have bolstered his alibi defense. He does not explain why he believes that Dubinsky would have offered such testimony or why Rosen rejected him as a witness, but Rosen's decision to do so does not compel the conclusion that he was derelict in his responsibility to evaluate the credibility and utility of potential witnesses and evidence, particularly since Kadlec's claim suggests that Rosen considered, but decided against, this witness. In assessing the performance of counsel, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' *Strickland,* 466 U.S. at 689. If the attorney's strategic decisions were sound when they were made, these decisions cannot support a claim of ineffective assistance. Certainly the decision not to call a witness to testify can be a strategic decision. *Foster v. Schomig*, 223 F. 3d 626, 631 (7th Cir. 2000) citing *United States v. Kozinski*, 16 F. 3d 795, 813 (7th Cir. 1994). Such a decision is sound "if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant. *Id*. citing *Hall v. Washington*, 106 F.3d. 795, 813 (7th Cir. 1994).

In this case, the record reflects that Ted Dubinsky employed Kadlec's co-defendant, Randy Miller, who was also charged in the Wagner homicide. Testimony showed that a pager

6

number secured by Miller through Dubinsky's company was located in Wagner's car at the time of his death. Interestingly, Miller's attorney also did not choose to call Dubinsky as a witness, which implies that both attorneys made a strategic decision about the utility of Dubinsky. Because Kadlec doesn't provide any contextual information about Dubinsky and why he believed that Dubinsky would have offered this testimony, It is hard to know if Dubinsky had changed his story, if it was determined that he had never made the statement in the first instance, or whether other evidence contradicted his alleged assertion. However, Kadlec's claim that Dubinsky would have been a helpful witness does not make it so. In the final analysis, Kadlec simply fails to show that his counsel failed to consider and properly evaluate the value of this alleged evidence.

      **C.**      **Ground III**: **Inadequate preparation of defense witnesses**

Kadlec next alleges that his attorney failed to properly investigate, prepare, and in one case, properly examine two of the defense witnesses called to support his alibi for the Wagner homicide. He identifies these witnesses as Martin Jensen, his former brother in law and Candace Kottke[1], his ex-wife.

With regard to Jensen, he asserts that Jensen testified that he had been asleep during the hours of Wagner's homicide, thus making it impossible for him to alibi Kadlec. He further complains that the government's cross examination of Jensen suggested that Jensen had been threatened with regard to his testimony. Accordingly he claims that his counsel did a substandard job of preparing the witness and that he was prejudiced because Jensen's testimony

---

[1]The defendant refers to this witness as Candy Kadlec, however the trial record reflects that at the time of her testimony she identified herself with the name Candace Kottke.

contributed to an inference that his alibi was contrived.   However, the record does not compel

the conclusion that Rosen's preparation of this witness was deficient.  Jensen testified that on the

date of the Wagner homicide he lived with the defendant and other members of the defendant's

family, and that he saw the defendant at their residence continuously throughout the day until

about 10:30 at night, when he retired.  He testified that at that time, the defendant was in his own

room watching TV. R. 1880: 4253.  While Kadlec is correct that this testimony doesn't

particularly advance his alibi, since Jensen could not account for the defendant after 10:30 p.m.,

it is also clear from a reading of Jensen's entire testimony that alibi was not its only purpose.

Jensen also testified that he and the defendant's sister had taken a loan to construct a garage on

the property, and that the garage had been built prior to the Wagner homicide. R. 1880: 4254.

This testimony was clearly offered to refute other testimony that Kadlec had used proceeds from

the Wagner drug rip off to construct the garage, and demonstrates that Rosen had other reasons

than alibi for calling this witness.  Finally, Rosen cannot be faulted for Jensen's responses on

cross examination. In fact, while Kadlec complains that the jury was left with the impression that

Jensen had been threatened to change his story, the record reflects that when confronted with

questions about whether he had previously made statements which implied that he had been

threatened, Jensen repeatedly and emphatically denied that any threats by Outlaws members had

ever occurred.  R.1880: 4270.

Similarly, Kadlec fails to that Rosen's overall performance was deficient in his

questioning of Kadlec's ex-wife, Candace Kottke.  Kottke testified that she had previously been

married to Kadlec and that he was the step father to two of her children who had been visiting

Kadlec on the date of Wagner's murder.  Kottke testified that she went to Kadlec's to pick up the

8

two girls at approximately 9:00 p.m. and that she remained there for about 45 minutes, ultimately leaving without the girls who wanted to remain with Kadlec overnight. She also testified that she knew Kadlec to be a close friend of Donald Wagner, and that he had been tearful when he told her that Wagner was dead. R. R. 1880: 4296 et. seq. Despite the overall helpful nature of this testimony, Kadlec complains that Rosen's first question to Kottke improperly elicited an admission that she has been convicted of an unknown felony offense some 20 years earlier. He deems this deficient performance since the federal rule generally precludes inquiry about convictions that are more than 10 years old. See Fed. R. Evid. 609(b).

Notwithstanding the fact that this was an apparent misstep by Rosen, this singular error does not rise to a level of deficient performance, nor does Kadlec establish that the error resulted in any prejudice to him   It is a common trial strategy for an attorney to attempt to diffuse the impact of negative information, such as a prior conviction, by eliciting the information from his or her own witness during the direct examination, and Rosen was clearly attempting to do. The record is not clear whether Kottke actually had a more recent conviction which was never explored, or whether Rosen had misunderstood the nature of her record and simply erred in the inquiry.  And while it is unclear from the record exactly when or why Kottke acquired her prior conviction (she said she didn't remember when or for what she was convicted ) Rosen's mistake about the potential admissibility of this evidence realistically had little or no impact on Kottke's credibility. Rosen didn't probe further, and the prosecution's cross examination did not touch on her admission to the distant conviction.  Kadlec cannot seriously argue that his was actually prejudiced by the answer to this one, possibly errant, question.

### D.       Ground IV: The defendant's decision to testify

9

Kadlec also complains that his counsel compelled him to testify by providing erroneous advice about the effect of testimony that he traveled to and was in Indiana, and that by compelling him to testify, counsel caused him to provide the prosecution with corroboration which would have been otherwise unavailable. The record is silent on the reasons for the defendant's decision to testify, and in his motion Kadlec provides but a single insight into the advice that he relied on to make the decision. Specifically, he claims that he relied on his counsel's assurances that his own testimony that he traveled to and was present in Indiana (the site of the murder conspiracy alleged in Racketeering Act 10) would work no prejudice in his defense, because traveling to and being in Indiana were "not determinant for a conviction for conspiracy." In fact, this was not erroneous advice, since traveling to and being in Indiana, *are not* determinate factors for this conviction. Rather, in order to find this racketeering act proven, the jury had to find much more. Jurors had to determine that Kadlec agreed with one or more persons to kill members of the Invaders Motorcycle Club in Lake County, Indiana, and that in furtherance of the conspiracy, one or more of the conspirators traveled to Lake County, Indiana to confront members of the Invaders Motorcycle Club. Three elements were necessary: 1) that Kadlec agreed with another to commit the crime of murder; 2) that Kadlec reached this agreement with the intent that the crime be committed; and 3) that Kadlec, or another person with whom he reached the agreement performed an overt act in furtherance of the agreement by traveling to Lake County, Indiana. The record contains ample evidence to support these elements. David Wolf, testified that he and other Outlaws from his chapter met at the Union Grove Clubhouse where O'Neill advised them that the region's president had been shot, and the Outlaws then agreed to go to Indiana to rumble with the Invaders at a speedway. There was discussion about whether they would go armed, and O'Neill

indicated that there would be plenty of firepower in Indiana. Other evidence showed that this firepower was in the form of high powered rifles and other weapons which were in a van manned by Milwaukee Chapter Outlaws. Wolf also testified that he rode his motorcycle from this meeting in Wisconsin to Indiana in a group which included Kadlec, Kruppstadt, Rostron and Hanson, and that upon arriving they took turns doing guard duty at the speedway to keep the Invaders from slipping in. He testified that the following morning the Outlaws met at the Gary Clubhouse where Randy Yager, the acting regional president rallied them with a declaration that they were "going to bust [those Invaders] up," and that the Outlaws then proceeded to the speedway where they set up an encampment to wait for the rival bikers. The encampment included the two vans containing weapons. James Schneider, who also testified that the Stateline Chapter members traveled to Indiana to shoot or beat or otherwise eliminate Invaders, and corroborating evidence was provided by J.R. Jones and Houston Murphy, as well as law enforcement officers who observed a column of Outlaws motorcyclists depart from the speedway, and who stopped an armored van. that contained the arsenal of weapons. In light of this evidence, there were ample facts to convince the jury that there was an agreement to murder rival Invaders members, that one or more of the parties to the agreement traveled to Indiana in furtherance of this conspiracy, and that Kadlec, was among those conspirators. Counsel cannot be deemed ineffective for advising Kadlec that his admission to traveling to Indiana would not be determinative of his guilt, and to acquiescing to Kadlec's desire to provide an alternative explanation for his actions in furtherance of his own defense.

     **E.**       **Ground V: Joining the pre-trial severance and misjoinder motions of co-defendants**

Kadlec further alleges that his counsel was incompetent because, rather than filing his

own motions for severance, he joined the severance and misjoinder motions of his co-defendants. He claims that his counsel should have argued that his circumstances were unique because he was named in fewer counts and fewer racketeering acts than most of his most co-defendants. He claims that he was prejudiced by the joint trial, since he was unfairly subjected to spillover evidence, and the jury was unable to properly compartmentalize the evidence as it pertained to him. In support of this, he points out that the jury found Racketeering Act 7 not proven as to him, despite the testimony of numerous witnesses, while the jury found Racketeering Act 10 proven, based on far less evidence.

The record does not support Kadlec's position that his counsel could have succeeded by filing a separate motion for severance based on prejudicial spillover. This issue was thoroughly litigated by counsel for his co-defendants, some of whom, like Kadlec, were named in fewer counts and racketeering acts than others. Blake, Hanson, Jensen, McVay, Meinen, O'Neill, Rostron and Warneke all filed motions for severance based on prejudicial spillover. See Round III Pre-Trial Motions: Magistrate Judge's Recommendations and Orders. With the exception of O'Neill, all of these defendants were similarly situated to Kadlec. Blake argued that he was charged in only four of the six counts and six of the 34 racketeering acts and that he would be inevitably victimized by spillover evidence against other defendants, particularly those who were charged in murders and conspiracies to commit murder. Hanson argued that he was charged in only two counts and five racketeering acts, and that there was a gross disparity and volume of evidence such that it would be impossible for the jury to sift through it and determine his guilt or innocence. Jensen argued that he was named in two counts and only three racketeering acts, and that the minimal amount of evidence against him would take only a few hours or a day to

12

present, so that the prejudicial effect of having to sit through a four month trial of six counts and 34 racketeering acts is obvious. McVay argued that his participation in the RICO conspiracy was relatively minor and that conflicting evidence about the murder conspiracy in which he was named would preclude a fair trial for him. Meinen argued that the was charged in only four of the racketeering acts, that the evidence against him was minimal and paled by comparison to the evidence against his co-defendants and that no jury could sort through the evidence and be able to follow limiting instructions. Rostron argued that he was named in only four racketeering acts, one of which was not even sanctioned by the Outlaws, that there was conflicting evidence as to a second act, and that as a peripheral player he would be unduly prejudiced by spillover evidence. Finally Warneke argued that was named in only two counts and four racketeering acts and that in a single trial he would be required to sit idly for the duration of a lengthy trial where the vast majority of the evidence dealt solely with criminal activities of other defendants.

In response to these allegations the magistrate court concluded that severance was not warranted. Acknowledging that the case was large and complex, the judge noted that usually the court handles differing evidence between differing defendants through limiting instructions. Quoting *Bruton v. United States*, 391 U.S. 123, 135 (1968), the magistrate judge said "Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense." The magistrate judge also noted that many of the racketeering acts are charged as conspiracies, and that Count 2 itself was a conspiracy. Citing *United States v. Saulter,* 60 F. 3d 270, 277 (7th Cir. 1995) the magistrate judge noted that if a defendant is proven to be a member of a conspiracy, he or she is responsible for the entire conspiracy and the

13

government may introduce and the jury consider any evidence of the conspiracy against the defendant who is a member. Finally the magistrate judge concluded that the fact that so much of the same evidence regarding the Chicago Region of the Outlaws as a racketeering enterprise and of the various conspiracies would be admissible at severed trials, severely reduced the benefits of separate trials to avoid spillover prejudice. After objections from the various defendants, this court adopted the magistrate court's recommendation.

In light of the magistrate judge's analysis with regard to the severance motions of similarly situated defendants, it is clear that a separate motion advancing Kadlec's position on the same grounds would not have secured him a separate trial. Nor does he now present a novel basis for distinguishing his situation from that of these others. Accordingly, his counsel was not deficient for failing to make a separate argument on his behalf. More importantly, the fact that Kadlec was found guilty of two racketeering acts, but not guilty of one, is evidence that the jury did follow the court's limiting instructions and the admonitions of various counsel during closing argument, and is evidence that the jury was able to compartmentalize the evidence against Kadlec, and that he was not the victim of unfair spillover.

### F.    Ground VI:    Failure to secure discovery materials

Kadlec also asserts that his counsel bumbled by failing to obtain investigative reports which he claims were missing or redacted. In his supporting brief he describes himself as the subject of a street corner shell game, unable to find the valuable pea, and he alludes to missing reports regarding Theodore Dubinsky and illegal Title IIII command post recordings, but he fails to articulate any cogent facts to demonstrate that such items existed or that his counsel did not secure all of the discovery materials necessary to defend his case.

14

**G.      Ground VII: Failure to challenge the admission of the Title III intercepts**

Kadlec also asserts that his counsel was deficient for failing to challenge the admission of the Title III intercept tapes, based on the mistaken belief that he was without standing. Again he fails to show that his counsel's performance was deficient or that he was prejudiced.  He is correct that to the extent that his voice was captured on any of the tapes that were intercepted he had standing to challenge their admission, and although he does not point to any specific tape that captured his voice, the record reflects that he was intercepted in T-50 during a conversation at O'Neill's residence on April 25, 1995.  However, he is incorrect that his counsel's performance was deficient because he failed to challenge the admissibility of the tapes.  Like the severance motions filed by his co-defendants and joined by his attorney, the Title III suppression issues were well and thoroughly litigated by counsel for his co-defendants, most particularly counsel for O'Neill, Powers and Kruppstadt.  Kadlec fails to identify any additional grounds that his own counsel might have advanced to secure a ruling that the tapes should be suppressed.

**H.      Ground VIII: Failure to attend evidentiary hearings**

Kadlec also complains that his counsel did not attend any of the evidentiary hearings that were held in connection with various motions filed by several of his co-defendants, although he asserts that his counsel joined the various motions for which these hearings were held. Again he fails to articulate what hearings were germane to any issues that pertained to his specific interests or how counsel's presence at any or all of the hearings would have advanced his interests.

**I.      Ground IX:   Counsel's attention to unrelated matters**.

Kadlec also complains that during his trial, his counsel worked on reports and briefs in unrelated cases, and used his leisure time to read Civil War magazines and maternity literature.

15

However, even if there were instances where this was true, the trial record refutes any inference that Rosen was inattentive to the case. In fact, Rosen cross examined each and every witness whose testimony pertained to the charges against Kadlec, and he questioned other witnesses in a manner which enabled him to elicit testimony favorable to Kadlec's position. For example, although Kadlec was not alleged to have been involved in Racketeering Act 15, the Coyne truck bombing, Rosen nonetheless cross examined Coyne, a Hell's Henchmen, with a series of questions designed to suggest that membership in a motorcycle club was no more than a social affiliation, and that some of the more menacing rhetoric employed by biker clubs was no more than rhetoric. In addition, Rosen demonstrated that he was on top of evidentiary questions that would effect Kadlec, posing various objections to the admission of evidence and joining the objections of others when those objections appeared to be helpful to Kadlec. The record simply does not reflect that Rosen failed to give proper attention to the activities at trial.

**J.    Ground X: Counsel's relationship with co-counsel**

Kadlec also complains that his counsel was deficient because he incurred repeated admonishments from co-counsel who accused Rosen of "serious prejudicial lapses of trial assistance." He identifies counsel for James Rostron and counsel for Kevin O'Neill as two of the attorneys who engaged in such criticism, and although he fails articulate the reasons for their concerns, there is a hint in a letter in from O'Neill's counsel which he attached to his §2255 pleading. In the letter, Attorney Marquis advises Kadlec that he believes Kadlec to have been "horribly" represented, based on such things as the "excruciating" nature of Kadlec's testimony, which he opines to be the result of inadequate preparation; indications from the marshals that Rosen was seen reading non-trial materials in the court room; and Marquis' own assertion that

16

Rosen was inept for eliciting testimony about Kottke's 20 year old conviction.

Despite Attorney Marquis' gratuitous communication to Kadlec, criticism by other counsel is not a ground for a finding that his counsel was in fact ineffective. Marquis and the other attorneys had the interests of their own clients to protect, and to the extent that Kadlec's trial testimony was inculpatory to those clients, they would necessarily see that testimony as flawed. In addition, the record does not support Marquis' other negative suggestions, that is, that by reading non-case related items at various points of the trial, counsel failed to give the case the attention that it required and that by eliciting testimony about Kottke's old conviction Rosen demonstrated himself to be ignorant of the law. In the final analysis, the opinion of other lawyers is simply not a ground for finding that Kadlec's right to the effective assistance of counsel fell short of constitutional requirements.

### K.      Ground XI: Failure to discuss the government's plea offers

Kadlec also complains that his attorney failed to advise him that the government had extended a plea offer to him. However, he fails to demonstrate that there ever was such a plea offer. The government did extend offers to several, but not to all of defendants charged in this case, and the government's records do not reflect that plea offer was ever extended to Kadlec.

### II.      Due Process Violation

### L.      Ground XII: Government's disregard of the interstate detainer act

The final complaint in Kadlec's original pleading is that the United States blatantly breached the provisions of the Interstate Agreement on Detainers (IAD) 18, United States Code, App. § 2, which he asserts resulted in a violation of his Fifth Amendment right to due process of the law. Specifically he complains that under Article IV ( c) and V( c) he was entitled to be tried

within 120 day of his arrival in the Eastern District of Wisconsin, or have the indictment dismissed with prejudice. The claim is without merit.

The Interstate Agreement on Detainers (the IAD), to which the United States is a party pursuant to 18 U.S.C., App. 2, provides an interstate mechanism by which a prisoner in a signatory jurisdiction (sending state) may secure trial on all charges for which detainers have been lodged against him by other signatory jurisdictions (receiving states). The IAD also provides that a receiving state may initiate a request for a prisoner from the sending state in the absence of a request by the prisoner. Once the receiving state commences criminal proceedings through this mechanism, the IAD affords the prisoner certain protections. Article IV( c) provides that the prisoner's trial in the receiving state must be commenced withing 120 days of his arrival, (except that for good cause shown in open court, the prisoner and his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance) Article IV( c) is generally known as the speedy trial provision. Article IV(e) provides that once the receiving state obtains custody of the person, it must try him prior to returning him to his original place of imprisonment. This provision is generally known as the anti-shuttling provision). Articles V( c) and (e) provide that the failure to comply with the speedy trial or anti-shuttling provision will result in a dismissal with prejudice. However, special provisions which apply when the United States is the receiving state allows that the dismissal may be without prejudice, 18, U.S.C., App. 2, sec. 9 (1), and also allows that the prisoner may be returned by court order, following adequate notice to the prisoner and the United States, so as to allow for a hearing on the issue, Title 18, U.S.C., App. 2, sec. 9 (2).

The IAD, which creates statutory rights is intended to eliminate the uncertainties created

18

by the existence of untried accusations in other jurisdictions which in turn obstruct prisoner programs of treatment and rehabilitation. Title 18, United States Code, App. 2, §2. See also, *United States v. Donaldson*, 978 F. 2d 381, 389 (7th Cir. 1992) citing *United States v. Mauro*, 436 U.S. 340, 343 (1977); *Neville v. Cavanaugh*, 611 F. 2d 673, 674, n. 1 (7th Cir. 1979.) Courts which have construed the IAD have found that it is intended to secure the right of a prisoner to rehabilitation free of the interruptions occasioned by repeated transfers. *Gray v. Benson*, 458 F. Supp. 1209, 1212 (D. Kan. 1978), citing *United States v. Ford*, 550 F. 2d 732, 742, (2nd Cir. 1977), aff'd *United States v. Mauro*, 4 36 U.S. 340 (1977).

In the instant case, Kadlec asserts that his sentence should be vacated because his conviction was secured in violation of the IAD's speedy trial requirement. [2] The record does not support his contention. Kadlec, who was a State of Wisconsin prisoner at the time he was indicted in federal court, made his initial appearance before Magistrate Judge William E. Callahan, Jr. on June 23, 1997. R. 64. At that hearing, Kadlec, who was represented by counsel, was arraigned on the charges contained in the indictment. In open court, the magistrate judge designated the case as a complex case and stated that pre-trial and jury trial dates would be set at a later time. The court also set a scheduling conference for June 25, 1997. By designating the case a complex case, and indicating that pre-trial and jury trial dates would be set on some date in the future, the magistrate judge effectively enacted the IAD exception which allows the court to extend the speedy trial time limits for good cause. *Id.* The continuance provisions of both Article III and IV are designed to permit the courts of the receiving state to postpone a trial when

---

[2] In a Rule 29 post verdict motion, Kadlec unsuccessfully challenged his conviction as having occurred in violation of the IAD's anti-shuttling provision. The court found that his two written waivers of the anti-shuttling provisions were valid.

Case 2:04-cv-00468-JPS   Filed 01/06/06   Page 19 of 27   Document 5

the interests of justice make such a continuance necessary or reasonable. See *United States v. Roy*, 830 F. 2d 628, 634 (7th Cir. 1987). Given the numerous charges in the indictment, and the voluminous amount of discovery material, there was ample good cause for the magistrate judge to postpone the trial beyond the 120 day time limit established by the IAD. At the same hearing, the magistrate judge also addressed the defendant's desire to return to state custody pending trial, and directed that the defendant to sign a waiver of the anti-shuttling provision of the IAD in order to trigger his ability to doing so. *Id.* Thus, the record does not support Kadlec's contention that his trial was held in violation of any IAD protections.

Additionally, even if the magistrate court's pronouncements at Kadlec's arraignment did not sufficiently trigger the exception to the speedy trial provision of the IAD, under the circumstances of this case, the periods of delay occasioned by the multiple motions filed on behalf of the defendant and his co-defendant operated to toll the running of Article IV pursuant to the Article VI (a) provision that the 120 day provision should be tolled whenever and for as long as the prisoner cannot stand trial. See *United States v. Nesbitt*, 852 F. 2d 1502 1516 (7th Cr. 1988).

In addition, Kadlec fails to demonstrate that he is entitled to the relief that he seeks even if there were violations of his rights under the IAD. Contrary to Kadlec's assertion that a failure to apply the provisions of the IAD implicated his due process rights, the Seventh Circuit has previously determined that IAD does not establish a liberty interest protected by the due process clause of the Fifth and Fourteenth amendments. See *Reed v. Clark*, 984 U.S. 209, 209 (7th Cir. 1993), where in response to a state prisoner's assertion that the IAD established liberty interests protected by the federal constitution, the Court said, "[A]ll the IAD does is prescribe procedures:

20

hearing before transfer, trial within 120 days of arrival, and so on. Procedures for adjudication are neither 'liberty' nor 'property' for constitutional purposes. Statutes and rules establish liberty or property interests only to the extent they prescribe substantive rules of decision." Thus, no constitutional right was implicated when Kadlec was not tried within 120 days of his arrival in federal court, and his complaint is merely that his trial was held in violation of federal statutory law. And while the violation of federal law is a cognizable§ 2255 claim, to succeed on a claim on this ground, he must show more than a violation of a statutory right. He must show a fundamental defect which inherently results in a complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure. See *United States v. Timmreck*, 441 U.S. 780 (1979)(discussing a defendant's rights under Fed. R. Crim. Pro. 11.) See also *Reed*, 984 F. 2d at 211-213, and cases cited therein. In this case, Kadlec fails to show that he was in any way prejudiced by the alleged violation of the IAD. Because the trial was continued beyond the 120 day time limit in Article IV ( c), his counsel was able to digest the voluminous discovery materials and to litigate pre-trial motions in preparation for trial, and because Kadlec waived his rights under the Article IV (e) anti-shuttling provisions, he was returned to the state institution pending trial, so that the delay in his trial in no way interrupted his state rehabilitation, which is one of the main objectives of the IAD

Finally, the record reflects that Kadlec effectively waived any right that he had to be tried under the speedy trial provisions of the IAD. At the time that the United States Marshal Detainer was lodged against him, Kadlec was advised of his right to a speedy trial, and refused to sign the document indicating whether he would or would not demand a speedy trial. Thereafter, he never raised the speedy trial issue in federal court, and he twice signed a document waiving his rights

under the anti-shuttling provision of the IAD, indicating his desire to be returned to state custody pending the federal trial. See Attachment 1.Thus, through his actions, he effectively waived the IAD right to a speedy trial, which because it is a statutory and not a constitutional right need not be a knowing and intelligent waiver. See *Webb v. Keohane,* 804 F. 2d 413, 414 (7th Cir. 1986) discussing waiver of the anti-shuttling provision of the IAD.  In summary, Kadlec does not establish that his sentence should be vacated and a new trial granted on the basis of a violation of his rights under the IAD.        .

### III.    Newly Discovered Evidence

### M.    Ground XIII: Newly discovered evidence

In a motion filed September 14, 2005, Kadlec seeks to amend his original §2255 petition to add a ground for relief which he entitles "Witness-Deals-Promises-Perjury." He asserts that while his original § 2255 petition was pending, he discovered new evidence to the effect that the prosecution failed to timely inform him of deals or promises for leniency that had been made to John Richard Jones, a government witness to one of the two predicate acts which the jury found proven as to Kadlec, and that the prosecution knowingly permitted Jones to perjure himself .

In support of his claim, Kadlec includes his own affidavit in which he explains that he learned of this newly discovered evidence sometime in July 2005, when he had a conversation with fellow Outlaws member Frank Wheeler, and he thereafter obtained a transcript of the testimony which Jones provided at Wheeler's 2003 trial in the Middle District of Florida. In addition to this affidavit and argument, Kadlec provides a copy of Jones' Florida testimony. However, an examination of Kadlec's submission in connection with the record of Jones' testimony in Kadlec's case, does not show that there is a reason to vacate his sentence and grant

him a trial based on newly discovered evidence.

At Kadlec's trial in Milwaukee in 2000, Jones testified about the events which occurred at the Illiana Speedway in Indiana, which form the basis for Racketeering Act 10 in the indictment. In summary, he testified as follows: He was a member of the Peoria Outlaws chapter, and he traveled to Indiana with a fellow Outlaws member at the direction of Wheeler, his chapter boss, who advised that they were going there to confront Invaders and/or Hell's Henchmen and that they would "get a victim." He understood this to mean that they would kill, beat or hurt someone. R. 1845:26, 27.    When he arrived at the speedway where there were numerous Outlaws who had gathered, and he had a conversation with Orvie, a Chicago Outlaw who instructed Jones to select a rifle from a van. R.1845: 32,33. He and another Outlaw each selected a rifle from a van containing other guns and he laid in the grass and waited about 30 to 45 minutes for the Invaders to arrive. R. R. 1845: 25, 38. After several hours, no Invaders had appeared and he along with the Outlaws who had assembled, left the speedway. R. 1845: 41. The transcript from Wheeler's trial reflects that Jones' testimony about this event was consistent with his testimony at Kadlec's. Def. App. 116-122; 146-148.

At Kadlec's trial, Jones was also questioned about his prior convictions, whether he was receiving consideration for his testimony that day, and whether he had contacted the government with a request for help following a previous arrest. R. R. 1845: 49.  He testified that he had three prior conviction which he identified for the jury, that he was not receiving consideration for his testimony that day and that he had not contacted the government for help with any arrest. *Id*.

Jones was extensively cross examined by the counsel for Kadlec and Kadlec's co-defendants.  In response to their questions, he testified that in 1995, a year after the events at the

Case 2:04-cv-00468-JPS   Filed 01/06/06   Page 23 of 27   Document 5

Illiana speedway, he had been interviewed about those events by ATF Special Agent Ronald Holmes but hadn't been promised any benefit for cooperation. R.1845: 65. He admitted that despite the information that he gave Holmes about his own conduct at Illiana, he was never charged in for racketeering in connection with that event R.1845: 113, 114. He also agreed that after he talked to agents from ATF, he was charged with a first degree kidnapping and robbery in Grinnell, Iowa, but that those the charges were no longer pending, and that ATF had nothing to do with the disposition of those charges. R. 1845: 66. He was also cross examined about other criminal acts he had committed and he admitted to being a user of both cocaine and methamphetamine, and to supplementing his government disability checks by selling drugs, doing armed robberies, and doing "collections" for other people. R.1845: 47, 48. He testified that he did not expect to be prosecuted for that activity. R.1845: 76.

At the Wheeler trial in Florida in 2003 he was questioned about how he had come to testify against Outlaws, and he stated that in the early 1990's he had been arrested in Iowa for the unlawful possession of a firearm after which he was interviewed by Holmes, who told him to cooperate or go to prison. He testified that he did cooperate with Holmes, and he didn't go to prison. He further testified that the statute of limitations had since run on that offense and that only remaining government leverage with regard to him, was its subpoena power, which was the reason that he was testifying at Wheeler's trial  App. 129. He testified that kidnapping and aggravated assault charges were pending, when he talked to Holmes, but were later reduced. App. 155.  When asked if he was put on probation for the meth charges after he testified at a previous trial in Tampa in 1995, he asserted that the probation was not as the result of work for the government, stating that he was never "working for the government," and had testified in

24

1995 because he had been subpoenaed.

Kadlec now argues that the time of his 2000 testimony, Jones had an undisclosed deal with Holmes to the effect that certain charges were dismissed or reduced in exchange for his cooperation. He bases this argument on Jones' 2003 testimony that Holmes said to him that he should cooperate or go to prison. This is inconsistent with his 2000 testimony that when he was interviewed by Holmes, he had not been promised any benefit for cooperation. However, this information falls short of providing the basis for a new trial based on newly discovered evidence.

Normally, a motion for a new trial based on newly discovered evidence must be brought within the 3 year time period prescribed by Fed. R. Crim. Pro. 33. However, because Kadlec styles this motion as one that alleges violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Singleton*, 144 F. 3d. 1343 (10th Cir. 1998) reversed en banc 165 F. 3d 1297(1999) and disapproved by *United States v. Condon* 170 F. 3d 68j7 (7th Cir. 1999) he brings his claim into the scope of §2255. However, because he does not meet the standards for a new trial based on newly discovered evidence, his motion for relief on this basis should be denied.

The law with respect to motions for new trials based on newly discovered evidence is fairly well settled:

> To warrant granting a motion based on newly discovered evidence, it must be shown (1) that the evidence was discovered since the trial; (2) that the evidence could not have been discovered sooner with the exercise of due diligence; (3) that the evidence is not merely cumulative or impeaching; (4) that the evidence is so material that it probably would produce a different verdict. See *United States v. Ellison*, 557 F. 2d 128, (7th Cir. 1977); *United States v. Curran*, 465 F. 2d 260, 264 (7th Cir. 1972).

In this case, the newly discovered evidence is merely impeaching evidence, and is not so material that it would probably produce a different verdict in his trial. Contrary to Kadlec's argument, the evidence of his guilt with regard to Racketeering Act 10 did not turn on the

testimony of JR Jones.  In fact, Jones was no more than a corroborating witness.  The primary

evidence came from David Wolf, a probate with Kadlec's own Outlaws chapter, who described

the reason for the journey to the Illiana speedway and the instructions that had been given by

their own  chapter president.  Wolf also identified Kadlec as a member of the group which rode

with him to Indiana to commit this crime.  Further evidence about the purpose of the trip and the

intent of the perpetrators came from James Schneider and from the circumstantial evidence

produced through the Indiana state troopers who stopped one of the Outlaws armored vehicles as

it left the speedway that day.  They testified that the van contained not only high powered rifles

and other firearms, but also grenades.  In light of this evidence, the testimony of Jones, who

testified that he had gone to the speedway to confront Invaders at the direction of the Peoria

chapter president and had actually selected a firearm and prepared to shoot one, was helpful to

flesh out the facts, but not key to Kadlec's conviction.

Moreover, in light of the vigorous cross examination of Jones regarding his prior

convictions, his long term criminal activity, and the fact that he had never been charged with

racketeering despite his admission of an intent to kill Invaders at the speedway on the day of the

Illiana event, Kadlec cannot seriously argue that additional impeachment evidence could have

made a difference.  Even if the jury had been told that Jones' initial statement to Holmes about

his knowledge of Illiana was prompted by a threat by Holmes[3], there is no reason to think that

the outcome of the verdict with respect to this Racketeering Act would have been different.

---

[3]Kadlec urges that Jones received a panoply of benefits from Holmes including the
reduction of the drug and firearms charge and the dismissal of a kidnapping and assault charge,
but provides no facts to demonstrate that the ultimate disposition of these matters was effected
by Holmes.

In the final analysis, Kadlec fails to show that any newly discovered evidence warrants vacating his sentence and providing him with a new trial.

## CONCLUSION

For the reasons set forth above, David Kadlec's §2255 motion for to vacate, set aside and correct his sentence should be denied and the petition dismissed.

Dated this 6th day of January 2006.

Respectfully submitted,

STEVEN M. BISKUPIC
United States Attorney

By:

s/CAROL L. KRAFT
Assistant United States Attorney
Carol L. Kraft Bar Number: 1000117
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1706
Fax: (414) 297-1738
E-Mail: carol.kraft.@usdoj.gov

27