# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

DAVID A. KADLEC,

        Petitioner,

        v.                           Case No. 04-CV-468

UNITED STATES OF AMERICA,

        Respondent.

_____

## ORDER

On May 18, 2004, David Kadlec ("Kadlec") filed a petition under 28 U.S.C. § 2255 to vacate, set-aside, or correct the federal sentence he currently is serving. This matter has been fully briefed and is now ready for decision. For the reasons set forth below, Kadlec's petition will be denied.

## BACKGROUND

On November 11, 1998, a grand jury sitting in this district returned a superseding indictment charging Kadlec, along with 16 other co-defendants, with Racketeer Influenced and Corrupt Organizations ("RICO") offenses, RICO conspiracy offenses, and drug conspiracy offenses. (*See United States v. O'Neill et al.*, Case. No. 97-CR-98, November 11, 1998 Superseding Indictment, Docket # 793.) Specifically, Kadlec was charged at counts one and two with violations of 18 U.S.C. § 1962(c) and (d). Kadlec pled not guilty to each of these offenses, and after several rounds of pretrial motions, he proceeded to trial. On

June 15, 2000, Kadlec was found guilty of both counts. He was sentenced to two concurrent terms of life imprisonment, to be followed by a five-year term of supervised release.

## ANALYSIS

Kadlec's petition sets forth 12 grounds where he alleges, at grounds one through eleven, that he suffered ineffective assistance of counsel in violation of his Sixth Amendment rights. (*See* Kadlec's Section 2255 Petition, Docket # 2) (hereinafter "Kadlec's Petition") At ground twelve, he argues that his rights under the Interstate Agreement on Detainers were violated. (*Id.*) Additionally, on September 14, 2005, Kadlec filed an addendum to his original petition setting forth a thirteenth ground for relief, at which he argues he has discovered new evidence showing that the government was not forthcoming with exculpatory materials. The government filed a response to Kadlec's petition, arguing that it should be denied as to all grounds. (Government's Response, Docket # 5) ( hereinafter "Gov't Resp.")

Section 2255 provides that a prisoner "may move the court which imposed the sentence to vacate, set aside, or correct the sentence" on the ground that his sentence was imposed in violation of the Constitution or the laws of the United States. To receive relief under section 2255, a petitioner must demonstrate a "fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185, 60 L. Ed. 2d 805, 99 S. Ct. 2235 (1979). The Seventh Circuit has also articulated that the substance of the petition

-2-

takes precedence over its form, and petitions that arise under section 2255 are properly treated as such. *Guyton v. United States*, 453 F.3d 425 (7th Cir. 2006). Kadlec's petition clearly alleges that his sentence was imposed in violation of his Sixth Amendment rights along with other constitutionally protected rights, and the court notes at the outset it falls classically within the purview of section 2255 petitions.

## I. Ineffective Assistance of Counsel

To establish that he was deprived of his right to effective counsel, Kadlec must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 695 (1984). Stated another way, Kadlec must establish that his attorney's performance was unreasonable if viewed against prevailing professional norms, and that he was prejudiced by this conduct. *Id.* When evaluating the attorney's conduct, the court is "highly deferential" towards counsel, and there is a presumption that the attorney performed within the bounds of a wide range of reasonable professional assistance. *Id.* at 669; *see also United States v. Holman*, 314 F.3d 837 (7th Cir. 2002). The reviewing court should also consider the attorney's conduct in the context of the case as a whole, not in isolated incidents of the attorney's representation. *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998). Thus, to meet this high burden, Kadlec must demonstrate that

-3-

he suffered "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687.

### A. Failure to Object to Search Warrant

Kadlec first claims that his trial attorney, Mark Rosen ("Rosen"), was ineffective for failing to challenge a search warrant executed in July 1995 at Kadlec's place of business. Kadlec argues that there were several bases on which Rosen could have moved for suppression. Specifically, Kadlec states that Rosen could have argued that the informant whose information formed part of the basis of the search warrant was unreliable and therefore called into question the soundness of the warrant. Kadlec further argues that Rosen's failure to object violated Kadlec's Sixth Amendment right to counsel and his Fourth Amendment right to be free from unreasonable searches and seizures. Kadlec's arguments fail for several reasons.

The Seventh Circuit has held that "[w]hen the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, we have required that a defendant prove the motion was meritorious." *United States v. Cieslowski,* 410 F.3d 353, 360 (7th Cir. 2005) (citing *Owens v. United States*, 387 F.3d 607, 610 (7th Cir. 2004)). Kadlec's petition and response do not provide any information suggesting that a motion to suppress the evidence found pursuant to this 1995 search would have been meritorious.

At the outset, Kadlec has failed to provide any challenges to the probable cause supporting the warrant. Probable cause to search exists when there is a fair

-4-

probability that an officer will find contraband or evidence of illegal activity at a specified location based on the totality of the circumstances. *United States v. Washburn,* 383 F.3d 638, 642 (7th Cir. 2004) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is a 'fluid concept,'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)), "and when an informant is involved, it may turn upon the informant's reliability, basis for knowledge, and degree of detail, as well as the ability of the police to corroborate the information." *Id.* (citing *United States v. Johnson*, 289 F.3d 1034, 1038-39 (7th Cir. 2002)). Kadlec attempts to impeach the confidential informant supporting the affidavit by elucidating this individual's criminal history and propensity to not tell the truth, but beyond these conclusory attacks, he does not claim why the search warrant was lacking probable cause. Additionally, he does not state what was obtained pursuant to the warrant, or if any evidence was used against him at trial. Indeed, the government's response details that no evidence from this warrant was used in its case-in-chief at trial. Kadlec does state that the evidence is used to impeach him, but this argument only works against him. Illegally obtained evidence *may* be used for impeachment purposes at trial. *See Walder v. United States*, 347 U.S. 62 (1954).

Kadlec is therefore unable to establish either of the *Strickland* prongs. He has not demonstrated that Rosen's conduct fell below an objective standard of reasonableness, and he also is unable to show prejudice because he does not point to any incriminating evidence obtained as a result of the supposed unlawful search,

-5-

nor does he explain, beyond impeachment, how any evidence was used against him at trial. Accordingly, Kadlec is entitled to no relief as to ground one of his petition.

**B.    Failure to Call Witnesses**

Next, Kadlec argues Rosen was ineffective for failing to call witness Ted Dubinsky ("Dubinsky"), whom Kadlec argues would have supported his alibi that he was not present at the Donald Wagner murder scene. Kadlec argues Dubinsky's testimony would have further strengthened his alibi testimony as he would have testified that Kadlec was not at the scene of the murder crime. Specifically, Kadlec states Dubinsky would have testified that "the person known as Kadlec was not one of the individuals he, Dubinksky, witnessed with Wagner near the time of his death the night of August 23, 1992." (Kadlec's Pet. 5.)

An attorney's trial strategy is subject to a highly deferential standard under the *Strickland* analysis, and furthermore, the Seventh Circuit has held, "usually, counsel's decision not to call a witness is a tactical decision not subject to review." *Barnhill v. Flannigan*, 42 F.3d 1074, 1078 (7th Cir.1994). When a petitioner claims his trial counsel failed to call a witness, as Kadlec is alleging, he must make a specific and affirmative showing as to what the missing evidence and testimony would have been, and he also must prove that this witness's testimony would have produced a different result at trial. *United States ex rel. McCall v. O'Grady*, 908 F.2d 170, 173 (7th Cir. 1990).

-6-

Kadlec has met the first requirement: he names a specific individual he argues should have been called, and states that this witness would have offered testimony that Kadlec was not present at the scene of the murder.   However, the court is not at all convinced that Kadlec is able to establish that Dubinsky's testimony would have resulted in a different result at trial. The record reflects that Rosen clearly engaged in an extensive investigation of the case and made several tactical decisions in reference to which witnesses to call.  Rosen called several witnesses on behalf of Kadlec's defense; most of whom had seen Kadlec during the day and evening of the murder and also testified about Kadlec's relationship with Wagner and his state of mind when he learned of Wagner's death.  Against the backdrop of the numerous witnesses Rosen did call, the court is constrained to deny Kadlec's petition on this ground. Additionally, the court finds the government's observation that no defense counsel called Dubinsky to testify rather compelling; it's reasonable to assume that this was a conscious decision rather than a neglectful overlook of valuable testimony.

## C.    Inadequate Examination of Witnesses Called

Kadlec next argues that the witnesses that Rosen did call for the defense were inadequate because they did not provide sufficient information in regards to Kadlec's alibi, and that they were also improperly examined.

Kadlec first complains that witness Martin Jensen ("Jensen") was improperly called because he could not provide sufficient information about Kadlec's whereabouts at the time the murder took place in order to adequately secure Kadlec's

Case 2:04-cv-00468-JPS   Filed 07/11/07   Page 7 of 25   Document 9

alibi. A review of Jensen's testimony reveals that although Jensen was not able to account for Kadlec's whereabouts at the time of the murder, his testimony was useful for other reasons. For example, Jensen's testimony was used to refute other testimony offered by the government that Kadlec used monies from the murder victim's drug rip off to construct a garage on their property. Jensen testified that a bank loan secured the money to build the garage, and that it was completed prior to Wagner's death. (*See* May 8, 2000 Tr. 4254-55.) Jensen also testified that there was no bad blood between Kadlec and Wagner, and that it was Jensen's perception that they were friends. (*See Id.* at 4252.) Therefore, although Jensen's testimony didn't strengthen Kadlec's alibi, his testimony appears to have been offered for other significant reasons. Accordingly, the court is unable to find that Rosen's representation fell below an objective standard of reasonableness by calling and questioning Jensen.

Next, Kadlec criticizes Rosen for his questioning of defense witness Candace Kottke ("Kottke). Specifically, Kadlec admonishes Rosen for questioning Kottke about a 20-year-old felony conviction, an inquiry generally precluded by Fed. R. Evid. 609(b) ( stating "[e]vidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed"). Despite this minor misstep, a review of Kottke's testimony shows that it was generally helpful in establishing Kadlec's alibi and for demonstrating his congenial relationship with Wagner. The mistake in question was quite minor, and the questioning about it was extremely brief:

-8-

> Q: Have you ever been convicted of a felony, ma'am?
> A: Yes, I have.
> Q. What was the felony for?
> A: I don't remember. It was a long time ago.
> Q: About how long ago?
> A: Twenty years.
> Q: Okay. Where do you live, ma'am?

(May 8, 2000 Tr. at 4297.)  Reviewed against Kottke's entire testimony, the court does not find that this error impaired the relative helpfulness of Kottke's testimony. Subsequent to the felony conviction questioning, Kottke testified that she knew Kadlec and Wagner to be friendly, that she saw Kadlec the evening of the murder of Wagner, and when she spoke to Kadlec about Wagner's murder, he was audibly distressed. (*Id.* at 4299-4902.)

It is also unclear if Rosen was simply mistaken as to the timing of Kottke's felony, or if Kottke had been convicted of other more recent felonies. Regardless of the reasons this question was asked, it certainly does not rise to the level of ineffective assistance of counsel.  A court's review of the *Strickland* standard does not simply analyze isolated incidences; the representation as a whole is analyzed under *Strickland*.  *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir. 1984) (citing *Strickland v. Washington*, 466 U.S. 696 (1984)).  Accordingly, the court does not find that the cumulative effect of Rosen's minor error in his questioning of Kottke amounts to ineffective assistance of counsel.

Case 2:04-cv-00468-JPS   Filed 07/11/07   Page 9 of 25   Document 9

## D.     Erroneous Advice to Testify

Kadlec also complains that Rosen compelled him to testify by giving him erroneous advice about the effect of his testimony that he traveled to Indiana and was present at the murder site. Kadlec further comments that Rosen's erroneous advice was that traveling to and being present at the murder site would not prejudice his defense because traveling to and being in Indiana were "not determinant for a conviction for conspiracy." (Kadlec's Pet. 9.) Kadlec is mistaken; this advice from Rosen was not in fact erroneous and did not cause him to incriminate himself by testifying to determinate factors for his conviction.

Kadlec, along with seven co-defendants, were charged at Count One, Racketeering Act 14, of the Superseding Indictment as follows:

> On or about June 26, 1994, in Lake Country, in the Northern District of Indiana, the defendants,[names omitted] did commit an act involving murder, that is, did knowingly and intentionally combine, conspire, confederate, and agree among themselves and with others known and unknown to the grand jury, to kill members of the Invaders Motorcycle Club, and in furtherance thereof, one or more of said defendants did travel to Lake County, Indiana, while armed with dangerous weapons, to confront members of the Invaders Motorcycle Club, in violation of Sections 35-42-1-1, 35-41-5-2 and 35-41-2-4 of the Indiana Statues.

(November 10, 1998 Superseding Indictment, Docket # 793 at 26.) As the government correctly notes, simply traveling to and being present in Indiana were not elements of the crime for conspiracy to commit murder. Rather, in order to prove this racketeering act, the government had to demonstrate (1) that Kadlec agreed with another to commit the crime of murder; (2) that Kadlec reached this agreement with

-10-

the intent that the crime be committed; and (3) that Kadlec, or another person with whom he reached the agreement performed an overt act in furtherance of the agreement by traveling to Lake County, Indiana. The trial record reflects that the government met its burden in proving these three elements; David Wolf testified he and other Outlaws traveled to Lake County, Indiana and that O'Neill, a co-defendant and then-president of the Outlaws, advised the group that they would be traveling armed to Indiana for a rough encounter with the Invaders. Kadlec's testimony was not outcome determinative as to what the government had to prove to obtain a conviction for this murder charge. Kadlec had a constitutional right to take the stand and testify, and he cannot claim Rosen was ineffective in advising him to exercise it.

### E. Cursory Joining of Co-defendant's Pre-trial Motions

Kadlec also argues that Rosen was ineffective for failing to file his own separate motion for severance, rather than joining co-defense counsels' motions. Kadlec further argues that Rosen was ineffective on this ground because Kadlec was uniquely situated because he was named in fewer counts and fewer acts than most of his co-defendants. As will be discussed below, Kadlec is unable to establish either prong of the *Strickland* standard for this ground.

As noted at section A of this order, the Seventh Circuit has held that when a petition argues that his attorney was ineffective for failing to file a motion, the petitioner must show that the motion would have been meritorious. *See United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005) (citing *Owens v. United States*,

Case 2:04-cv-00468-JPS    Filed 07/11/07    Page 11 of 25    Document 9

387 F.3d 607, 610 (7th Cir. 2004)).  A review of the record does not support that Kadlec's situation was so unique such that if Rosen filed a separate and individual motion, he would have secured severance for Kadlec. The issue of severance was thoroughly litigated by several of Kadlec's co-defendants during the pre-trial stages of this prosecution.  Eight of the seventeen defendants filed motions for severance based upon the potential of prejudicial spill-over, and several of the defendants filing for severance were charged in less counts and less acts than Kadlec.  (*See* August 28, 1998 Order, Docket # 720 at 99.) ( hereinafter "August 28, 1998 Order.") Magistrate Judge William E. Callahan, Jr., to whom the pre-trial motions in this case were assigned, reviewed this issue at length under applicable Seventh Circuit law on severance.  Magistrate Callahan articulated the necessary showing for establishing prejudicial spill-over; that the defendants must rebut the presumption that a jury will (1) capably sort through the evidence, and (2) follow instructions from the court to consider each defendant separately. (*Id.*) ( citing *United States v. Lopez,* 6 F.3d 1281, 1285 (7th Cir. 1993) and *United States v. Edwards*, 36 F.3d 639, 647 (7th Cir. 1994)). Magistrate Callahan also noted that there is a strong presumption to favor joint trials of individuals who have been jointly indicted, particularly in the cases of conspiracies. (*Id.*)  After reviewing the motions and arguments, Magistrate Callahan concluded that severance was not appropriate because even if the defendants were tried separately, the government would be introducing substantivally similar evidence at each trial to prove the conspiracy to violate the substantive RICO charges; thus, the function or

-12-

potential benefit of a separate trial would be greatly diminished. (*Id.* at 104-5.) Additionally, Magistrate Callahan noted that the court could give the jury clear limiting instructions such that the jurors would only consider the evidence as to each defendant individually, thereby minimizing if not eliminating prejudice.

This analysis would have been similar if Rosen were to have filed a separate motion requesting severance as to Kadlec's trial. Kadlec was not charged in all counts nor all acts, but similar evidence would have been introduced even if he were tried separately. Additionally, his argument that the jury found some racketeering acts proven to him and not others actually supports Judge Callahan's suggestion that the jurors would have the ability to follow the limiting instructions given by the court. Therefore, the court finds that Rosen was not ineffective for failing to file a separate severance motion because Kadlec was not in a different position than the other defendants. Moreover, the jurors' verdicts demonstrated that they were able to follow the limiting instructions of the court in that they found that the evidence did not prove Act # 7 as to Kadlec; this is precisely the presumption the defendant must overcome, and the results at trial show that Kadlec would not have been able to establish grounds for severance.

### F.    Failure to Object to Non-Disclosure of Evidence by Law Enforcement

On this ground, Kadlec does not state precisely what Rosen was ineffective for, but he admonishes law enforcement for the "withholding of investigative information."

-13-

(Kadlec's Pet. 10.) Kadlec implicates Rosen's representation only by stating "counsel's assistance was as detracted from his client's interests as those of law enforcement." (*Id.*) Vague, indirect, complaints fall well short of meeting the *Strickland* standard for showing that an attorney's representation fell below a bar of objective reasonableness. *See Hodges v. United States,* 316 F. Supp. 2d 688, 693 (S.D. Ill. 2004). Accordingly, Kadlec's petition is denied on this ground because he makes no showing that Rosen's performance was defective.

### G. Failure to Object to Title III Evidence

Kadlec also argues that Rosen was ineffective for failing to object to the Title III evidence that was used at trial. Kadlec states that Rosen should have challenged the Title III interceptions in his case, and that he was ineffective for failing to do so. Kadlec argues (1) "law enforcement possessed no authorization for Title III surveilance [sic] implementation"; (2) "law enforcement possessed no consenting party to such interception"; (3) "law enforcement was without workable surveillance [sic] implementation strategy when or after original authorization was obtained"; and (4) "law enforcement's duplicitious, apparatus placed interception would not have occured [sic] but for unlawful conduct." (Kadlec's Petition 12.)

First, Kadlec's statement that Rosen did not file a motion challenging the Title III interceptions is not wholly accurate; Rosen did file a motion to adopt a co-defendant's motion doing the same, and the motion to adopt was granted by Magistrate Callahan (*See United States v. Kevin O'Neill,* et al., 97-CR-98 at

-14-

Docket ## 610 and 720.) Second, Kadlec would be unable to prove, as he must for relief, that had Rosen brought a separate motion on these issues, it would have been meritorious. *See United States v. Cielslowski*, 410 F.3d 353, 360 (7th Cir. 2005). Each of these issues were heavily litigated at the pretrial stage of the prosecution, particularly in regards to the matters Kadlec challenges. Each judicial officer handling these challenges and the Seventh Circuit unequivocally determined that the conduct in Kadlec's case did not violate Title III regulations, nor was it unlawful; nor did any of the defendants suffer Fourth Amendment violations. *See United States v. Warneke*, 310 F.3d 542, 545 (7th Cir. 2002). Generally, courts may not upset the determinations of the appeals court in habeas proceedings. *See Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995). Accordingly, Kadlec's challenges are without merit and the court is constrained to deny relief on this ground.

## H. Failure to Attend Evidentiary Hearings

Kadlec argues that Rosen's failure to attend the evidentiary hearings in this case is a per se showing of ineffective assistance of counsel. Despite Kadlec's criticism, he does not demonstrate how he was prejudiced by Rosen's nonappearance at the hearings, nor is he able to specify what hearings Rosen did not attend. Moreover, the pre-trial record indicates that Rosen brought and joined several motions relating to the evidence at trial, and against this backdrop, the court finds that allegations that Rosen did not attend hearings to be insufficient to sustain a claim for ineffective assistance of counsel.

Case 2:04-cv-00468-JPS   Filed 07/11/07   Page 15 of 25   Document 9

### I.     Failure to Adequately Defend at Trial

Kadlec criticizes Rosen's actions at trial, and argues that his alleged inattentiveness during the trial amounted to ineffective assistance of counsel. Specifically, Kadlec argues Rosen was ineffective for reading non-related trial materials during the trial and by spending his time devoted to other matters during the course of Kadlec's representation.

The court finds Kadlec's allegations to be without merit. Indeed, a review of the pretrial and trial record seems to indicate that Rosen spent an enormous amount of time devoted to his client during the pretrial stages, and furthermore that he was exceptionally attentive during trial as well. Not only did Rosen file and join numerous pretrial defense motions, but he vigorously defended Kadlec at trial. He conducted thorough cross-examinations of each government witness implicating Kadlec in the criminal activities he was charged with, and he also presented several defense witnesses to testify on behalf of Kadlec. Against this backdrop and without more than Kadlec's vague allegations, the court does not find Rosen's representation to be ineffective.

### J.     Admonishment by Co-defendant's Attorney

Kadlec also argues that Rosen's representation fell below an objective standard of reasonableness because of admonishments Rosen received from other co-counsel, specifically, William Marquis ("Marquis"). Kadlec attached a letter from Marquis in which Marquis sets forth several reasons why he believed Kadlec was

-16-

poorly represented. (Exhibit B.) First, Marquis comments that United States Marshals observed Rosen reading non-trial materials; second, he comments about the improper questioning of witness Kottke and her felony conviction; and third, he comments that Kadlec himself did not seem adequately prepared (and faults Rosen for this) during his testimony. (*Id.*)

Despite these gratuitous statements from Marquis, another attorney's criticism does not amount to ineffective assistance of counsel. As noted above, the court has considered Rosen's representation in each of these instances and found that they do not rise to the level of ineffective assistance of counsel. Marquis' letter, four years after the trial took place, does not change the court's position or analysis of these claims. Accordingly, relief on this ground will be denied.

### K. Failure to Communicate Plea Offers Made by Government

Kadlec argues that Rosen was ineffective for failing to inform Kadlec of any plea offers proffered by the government. It is well-settled that the *Strickland* test applies to the plea process. *Hill v. Lockhart,* 474 U.S. 52, 57 (1985). The Seventh Circuit has held that an attorney's failure to advise his client of plea offers extended by the government falls below an objective standard of reasonableness, and is therefore a potentially cognizable claim of ineffective assistance of counsel. *United States v. Golden*, 102 F.3d 936, 943 (7th Cir. 1996) (quoting *Johnson v. Duckworth*, 793 F.2d 898, 902 (7th Cir. 1986)). In addition, the petitioner must establish, through objective evidence, that "there was 'a reasonable probability' that a defendant would

-17-

have accepted the proposed plea agreement without defense counsel's incompetent advice." *Paters v. United States*, 159 F.3d 1043, 1046 (7th Cir. 1998) (citing *Toro v. Fairman,* 940 F.2d 1065 (7th Cir. 1991)).

However, in the government's response, it claims that its records do not show that a plea offer was ever extended to Kadlec. (Gov't Resp. 17.) A petitioner alleging ineffective assistance of counsel for failure to communicate a plea offer must provide the court with proof that a plea offer was actually extended. *See Gray-Bey v. United States*, 156 F.3d 733, 739 (7th Cir. 1998) ( noting that § 2255 petitions must be accompanied by proof of petitioner's allegations); *see also Mitchell v. United States*, 359 F.2d 833, 837 (7th Cir. 1966) ( "concerning petitions under § 2255: specific facts should be alleged to support the claim [and the] petitioner must show that he has proof of his allegations beyond unsupported assertions"). In light of the government's statements that a plea agreement was never offered, Kadlec is not able to establish the performance prong of the *Strickland* test, and the court is once again constrained to deny his petition on this ground.

## II.    Violation of Interstate Agreement on Detainers Act

In addition to his allegations of ineffective assistance of counsel, Kadlec also argues that his conviction and sentence should be vacated because of violations of the Interstate Agreement on Detainers. Kadlec argues that his conviction was in violation of his rights to a timely trial under this statute, as well as his Fifth Amendment due process rights. Kadlec's argument is without merit.

-18-

The Interstate Agreement on Detainers Act ("IAD") provides an interstate mechanism by which a prisoner in a sending state may secure trial on all charges for which detainers have been lodged against him by another receiving state. 18 U.S.C. App. 2 § 2. Once the receiving state commences criminal proceedings, the IAD affords prisoners certain protections. Article IV(c) of the IAD provides that the prisoner's trial in the receiving state must be commenced within 120 days of his arrival. *Id.* at Art. IV(c). The purpose of the IAD is to create "a more efficient and uniform system of inter-jurisdictional rendition," and also to "alleviate the abuses often suffered by prisoners against whom detainers were lodged." *See* Christopher D. Cerf, *Federal Habeas Corpus Review of Nonconstitutional Errors: The Cognizability of Violations of the Interstate Agreement on Detainers*, 83 Colum. L. Rev. 975, 977 (1983). The authors of the IAD intended strict compliance with its provisions, and the penalties for a jurisdiction's non-compliance are severe: dismissal of otherwise sound indictments and complaints. *Id.; see also* 18 U.S.C. App. 2 § 2, Art. V(c) (2006) (stating if the defendant is not brought to trial within the allotted time period, the "appropriate court of the jurisdiction where the indictment, information, or complaint has been pending shall enter an order dismissing the same with prejudice").

Most significantly, this court has previously found that Kadlec validly waived his rights under the IAD during this criminal prosecution. This matter was thoroughly resolved in the court's order denying Kadlec's motion to dismiss the indictment based upon IAD violations. (*See* August 25, 2000 Order, Docket # 1619 at 55-57.) In the

August 25, 2000 order, this court noted that Kadlec signed waivers renouncing his rights under the IAD on two different occasions. First, on June 23, 1997, Kadlec agreed to "waive, renounce, and abjure any right or claim which he may or might otherwise have to remain in the custody of the United States Marshal for the Eastern District of Wisconsin pursuant to any requirements of the Interstate Agreement on Detainers." (*See id.*) Then, on November 19, 1998, Kadlec signed a second waiver when he appeared before the court when the superseding indictment was returned, and in this waiver, he further agreed:

> [to] waive my right to dismissal with prejudice of the instant federal charges, if I should return to the custody and control of the State of Wisconsin and return to incarceration in the penal system of the State of Wisconsin before trial and any further proceedings are had on the instant federal charges.

(*Id.*) In the court's order, it found that this waiver did not expire after a single transfer, and that Kadlec had not given any indication that he wanted to revoke his waiver under the IAD. Thus, at the outset the court notes that Kadlec has waived his IAD rights.

In addition to Kadlec's waiver of his IAD rights, this case fell well within the statutorily permitted exceptions of the IAD's requirements. Despite the IAD's strict guidelines, there are exceptions to the 120-day trial clock provided within the statute itself. The IAD provides that a court may make appropriate findings and determine that reasonable extensions and tolling of the trial clock would be allowed in a certain defendant's case. *See* 18 U.S.C. App. 2 § 2, Art. III(a). The IAD states that when

-20-

good cause is shown, "the court having jurisdiction of the matter may grant any necessary or reasonable continuance." *Id.* At Kadlec's initial appearance before Magistrate Callahan on June 23, 1997, the case was designated as complex, and this finding effectively invoked the provision of the IAD that would allow the court more than 120 days to bring the defendant to trial. (*See* June 23, 1997 Hearing Minutes, Docket # 64.) Moreover, this case involved extensive pretrial motions filed on behalf of the defendants and the government, as well as a interlocutory appeal; these circumstances certainly qualified as necessary and reasonable tolling periods under the IAD. *See, e.g., United States v. Dawn,* 900 F.2d 1132 (7th Cir. 1990) ( affirming lower court's finding that a pending motion filed by the defendant tolled the speedy trial provisions of the IAD); *United States v. Walker,* 924 F.2d 1 (1st Cir. 1991) (holding that motions will toll the IAD speedy trial clock).

Additionally, the Seventh Circuit, in concurrence with several other circuits, has established that the IAD does not create constitutionally protected rights; it only creates federal statutory rights. *Reed v. Clark*, 984 F.2d 209, 210 (7th Cir. 1993). Thus, Kadlec cannot claim that he suffered due process violations because the IAD does not create constitutional rights. Furthermore, the Supreme Court has held that when no objection is filed to the trial date at the time it is set, and where the defendant suffered no prejudice from the timing of the trial, challenges under the IAD in habeas proceedings are not cognizable. *Reed v. Farley*, 512 U.S. 339, 342 (1994).

Case 2:04-cv-00468-JPS   Filed 07/11/07   Page 21 of 25   Document 9

Therefore, against the backdrop of Kadlec's previous waivers, the complexity of this case as well as the enormous number of pretrial motions; and the fact that Kadlec did previously object to the trial date, the court concludes that Kadlec has suffered no cognizable violations under the IAD.

## III. Motion to Amend Section 2255 Petition

On September 14, 2005, Kadlec filed a motion to amend his petition based upon newly discovered evidence. In his motion, Kadlec states that during the pendency of his petition he discovered that the government failed to disclose "deals" the government made with trial witnesses. The government responded that Kadlec's motion was without merit and should be denied.

Kadlec's motion to amend asserts that the government knowingly allowed witness John Richard Jones "Jones" to offer perjured testimony in regards to his "deals" with law enforcement. Kadlec's support for this assertion is that Jones was called to testify in two separate trials, and while he gave similar testimony at each, there was "one glaring difference, Jones now testifies that his cooperating with law enforcement to the Illiana Speedway murder came about as a direct result of a 1995" deal for cooperation. (Kadlec's Motion to Amend 5-6.) This testimony is a slight variance from Jones' testimony at Kadlec's 2000 trial where he testified that no deal had been made with law enforcement, although he acknowledged that he may have been favorably treated as a result of his cooperation with law enforcement. (*See* March 28, 2000 Tr. 45-48.) Kadlec frames his motion as a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and requests a new trial.

Case 2:04-cv-00468-JPS   Filed 07/11/07   Page 22 of 25   Document 9

To succeed on a motion for a new trial based upon newly discovered evidence, Kadlec must show: (1) that the information came to his knowledge only after trial; (2) that it could not have been discovered sooner through the exercise of due diligence; (3) that it is material, not merely impeaching or cumulative; and (4) that the information would probably lead to an acquittal in the event of a new trial. *United States v. Peters*, 776 F. Supp. 365, 367 (N.D. Ill.1991) (citing *United States v. Leibowitz*, 857 F.2d 373, 380 (7th Cir. 1988)).

Kadlec avers that he was not aware of the disparate testimony until July 2005, which is clearly after his trial; Kadlec further states that the testimony in question did not even happen until after his trial. Thus, Kadlec meets the first requirement for securing a new trial. Additionally, he would likely be able to establish that he would not have discovered this testimony prior to his trial because the testimony in question took place in 2003, three years after Kadlec's trial.

However, and most importantly, Kadlec is not able to establish the third and fourth requirements that the testimony is material and would likely result in an acquittal in a new trial. Although Jones' truthfulness and motivation for testifying are clearly relevant and important factors for jurors to consider in weighing the evidence, his "deal" with law enforcement was not material information for his testimony. He was straight-forward about the favorable treatment he had received for his own prosecutions and the jurors were made aware of these facts. Furthermore, it's highly unlikely that this new information would lead to an acquittal of Kadlec on this murder

-23-

charge. Jones' testimony, while helpful to the government, simply corroborated testimony of other key government witnesses such as David Wolf. Wolf testified to explicit facts about Kadlec's involvement and presence at the murder trip. The government also called James Schneider to corroborate the purpose of the trip to the Illiana Speedway.

Additionally, Jones was cross-examined thoroughly by the defense lawyers, and impeaching evidence was offered on behalf of his prior criminal activity and cooperation with law enforcement. The cross-examination covered information about Jones' crimes and the fact that he had not been prosecuted for several criminal acts he committed. (*See* March 28, 2000 Tr.72. ) Jones was also up-front about the fact that he had been called as a witness by the United States in this proceeding and in trials in other jurisdictions. (*Id.* at 46.) In light of these factors, Kadlec cannot reasonably argue that the additional 2003 testimony would offer anything more than cumulative information about Jones' character and motivation for testifying. Therefore, the court finds that he has not met the necessary factors set forth in *Leibowitz* for a grant of a new trial, and is constrained to deny Kadlec's amended petition on ground thirteen.

In sum, Kadlec's petition and amendment do not provide any grounds for the court to find that he is entitled to relief under section 2255.

Accordingly,

**IT IS ORDERED** that Kadlec's petition under 28 U.S.C. § 2255 be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Kadlec's amended petition under 28 U.S.C. § 2255 be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** with prejudice.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this __11th__ day of July, 2007.

BY THE COURT:

 s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge